## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TROY KIRK, | CASE NO. 3:13-cv-02735-MWB-GBC |
| Plaintiff, | (JUDGE BRANN) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 10, 11, 14, 15, 19 |

## REPORT AND RECOMMENDATION

### I.       Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Troy Kirk for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff asserts that the administrative law judge ("ALJ") erred in finding that his complaints of disabling limitations were not fully credible. Specifically, Plaintiff asserts that the ALJ erroneously discounted his credibility on the ground that his claims were not supported by objective medical evidence. In making this argument, Plaintiff cites a variety of objective findings. However, a state agency medical expert reviewed almost all of the objective findings identified by Plaintiff. The medical expert

concluded that these findings supported limiting Plaintiff to a range of light work, but did not support finding that he had disabling limitations.

An ALJ may rely on a medical expert's opinion to find that objective medical evidence fails to support a claimant's allegation of disabling symptoms. Here, Plaintiff does not acknowledge this medical expert opinion in his brief or reply. Plaintiff provides no reason to conclude that the ALJ was not entitled to rely on the medical expert interpretation of the objective evidence. Thus, the ALJ did not err in concluding that objective medical evidence failed to support Plaintiff's claims. The medical expert on which the ALJ relied also cited Plaintiff's medication treatment history. Plaintiff's medication treatment history showed repeated requests for narcotic medication, noncompliance with narcotics contracts, and possible narcotic withdrawal as the basis for his symptoms. Plaintiff does not address the medical expert's reliance on his treatment history to conclude that the medical evidence failed to support his claim.

Under the deferential substantial evidence standard of review, the Court is bound by the reasonable conclusions of the ALJ. Here, the ALJ reasonably relied on the medical expert. The medical expert reviewed the objective medical evidence, including Plaintiff's medication treatment history, and concluded that it did not support Plaintiff's symptoms. Thus, substantial evidence supports the ALJ's conclusion that Plaintiff was not fully credible due to a lack of objective

support. For the foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On September 11, 2009, an administrative law judge ("ALJ") denied a previous application for benefits by Plaintiff under the Act. (Tr. 68-81). On November 22, 2010, Plaintiff filed an application for DIB under the Act. (Tr. 160-62). On December 28, 2010, the Bureau of Disability Determination denied this application, (Tr. 82-91) and Plaintiff filed a request for a hearing on February 1, 2011.  (Tr. 97). On December 8, 2011, an ALJ held hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 42-67). On February 23, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 24-41). On March 5, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 22-23), which the Appeals Council denied on September 3, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-7).

On November 8, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On February 25, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 10, 11). On May 22, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 14). On June 25, 2014, Defendant filed a brief in

response ("Def. Brief"). (Doc. 15). On November 5, 2014 the case was referred to the undersigned Magistrate Judge. On June 17, 2015, Plaintiff filed a brief in reply ("Pl. Brief"). (Doc. 19). The matter is now ripe for review.

## III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also

determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§
404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The
claimant bears the burden of proof at steps one through four.  If the claimant
satisfies this burden, then the Commissioner must show at step five that jobs exist
in the national economy that a person with the claimant's abilities, age, education,
and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.
1993). The ultimate burden of proving disability within the meaning of the Act lies
with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

Specifically, the Act provides that:

> An individual shall not be considered to be under a disability unless
> he furnishes such medical and other evidence of the existence thereof
> as the Commissioner of Social Security may require. An individual's
> statement as to pain or other symptoms shall not alone be conclusive
> evidence of disability as defined in this section; there must be medical
> signs and findings, established by medically acceptable clinical or
> laboratory diagnostic techniques, which show the existence of a
> medical impairment that results from anatomical, physiological, or
> psychological abnormalities which could reasonably be expected to
> produce the pain or other symptoms alleged and which, when
> considered with all evidence required to be furnished under this
> paragraph (including statements of the individual or his physician as
> to the intensity and persistence of such pain or other symptoms which
> may reasonably be accepted as consistent with the medical signs and
> findings), would lead to a conclusion that the individual is under a
> disability.

42 U.S.C. § 423(d)(5)(A); 42 U.S.C.A. § 1382c(a)(3)(H)(i) ("In making

determinations with respect to disability under [the SSI] subchapter, the provisions

of sections 421(h), 421(k), and 423(d)(5) shall apply in the same manner as they apply to determinations of disability under subchapter II of this chapter").

## V. Relevant Facts in the Record

### a.      Evidence reviewed by state agency physician Dr. Maas

Plaintiff was born on October 1, 1964 and was classified by the Regulations as a younger individual throughout the relevant period. (Tr. 35); 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and past relevant work as a crew leader for a restoration company, a dishwasher, a maintenance mechanic, and a tow truck driver. (Tr. 35).

Plaintiff began complaining of foot and ankle pain to treating providers as early as 2004, and imaging studies indicated degenerative changes at that time. (Tr. 860-61). In 2007, testing indicated osteoporosis suggesting a high risk of fracture. (Tr. 870-72). Plaintiff continued working full-time through October of 2007 in maintenance and as a dishwasher. (Tr. 185, 187-88). Plaintiff earned between $18,214.65 and $20,081.43 in each year from 2002 through 2007. (Tr. 145). Plaintiff reported to his treating provider that he stopped working October of 2007 because he was "laid off." (Tr. 270).

Plaintiff remained off work from October of 2007 to September of 2008. (Tr. 185). Plaintiff established care with primary care provider Dr. Darshal Patel, M.D. on November 1, 2007. (Tr. 584). On November 2, 2007, he applied for

benefits under the Act, alleging disabling limitations from his impairments beginning October 14, 2007. (Tr. 71). In January of 2008, Plaintiff was hospitalized at Pocono Medical Center for chest pain and shortness of breath. (Tr. 385, 551-79, 707-10). Plaintiff had no chest pain the following day and was discharged. (Tr. 386). Plaintiff followed-up with Dr. Patel on January 21, 2008. (Tr. 580). Dr. Patel noted that Plaintiff "was admitted for chest pain. Stress test was negative. No recurrence of chest symptoms. Patient denies any exertional chest pain, dyspnea, palpitations, syncope, orthopnea, edema or paroxysmal nocturnal dyspnea." (Tr. 580). Plaintiff reported stress, anxiety attacks, insomnia, and being unable to work due to his medical condition. (Tr. 580). Physical examination showed no abnormalities. (Tr. 580). On March 31, 2008, his first claim for benefits was denied at the initial level, and Plaintiff requested a hearing by an ALJ. (Tr. 71).

Plaintiff was also treating with Dr. Ronald Harris, M.D., for adrenal hyperplasia. (Tr. 269). In May of 2008, Dr. Harris summarized his history:

> The patient was diagnosed at age 5 and used to see Dr. Moshang at Hahneman and now CHOP until age 12. He was seen last by Dr. Moshang at age 16 when he had what sounds like bilateral aseptic necrosis of the femoral heads. Bilateral hip pinnning occurred at age 16.
> …
> The patient has had bilateral stress fractures in his feet discovered in the early 1990's. The patient was placed on fosamax for the past three years.

(Tr. 269). Dr. Harris further explained:

> The patient stopped his testosterone injections monthly up to about two months ago. We never got the old records from CHOP to assess severity or cause of low testosterone when he was started on this in his teenage years. Since stopping his androgen injections, the patient feels crummy and cranky.
> …
> He had been very sick as an infant and he was told he never should be off steroids. He denies any adult adrenal crisis. He is knowledgeable re: doubling his dose of steroids if he is sick. He does not have a medialert bracelet and he was counseled with regard to needing this. He admits to markedly less salt craving since being on florinef.

(Tr. 269). Plaintiff had taken monthly testosterone injections since he was sixteen.

(Tr. 270). Plaintiff reported fatigue, difficulty sleeping, snoring and depression secondary to the death of his parents and being laid off work. (Tr. 270). He reported pain in his feet that was a ten out of ten, but indicated he had no difficulty walking. (Tr. 288). Examination indicated obesity, but was otherwise normal, with a normal gait. (Tr. 271). Dr. Harris continued his medications. (Tr. 272). Physical examination with Dr. Patel the same month was normal. (Tr. 596).

Plaintiff treated with neurologists Dr. Martha Boulos, M.D. and Dr. Slobodan Miric, M.D., at the Neurology Center, every two months in 2008. (Tr. 231-38). In January of 2008, examination showed depression with a flat affect, along with muscle atrophy. (Tr. 238). Dr. Miric prescribed "Duragesic [fentanyl] patch 75 meg and… Percocet 5/325 mg 1-2 tablets every 4 to 6 hours, as needed." (Tr. 238). Plaintiff experienced confusion when his narcotic pain medication ran

out. (Tr. 237). Plaintiff continued to exhibit atrophy in February, March, May, and July of 2008 and continued to be treated with Duragesic and either Percocet or morphine. (Tr. 233-37).   In July of 2008, Dr. Miric noted that Plaintiff "discontinued Effexor because he felt it was causing the fatigue and just tried the Prozac by himself and escalated properly from 20 mg to 80 mg in 4 weeks and he says that this medication feels well and his depression is much better. I spoke to Troy that this is not the proper way to take the medicine and he should not choose to take medicine without doctor's prescriptions and advice." (Tr. 233). However, because the medication worked for Plaintiff, he was allowed to continue that dosage of Prozac. (Tr. 233).

Plaintiff treated with Dr. Robert Grob, D.O. in 2008 for left knee pain. (Tr. 226). He had "been taking corticosteroids for an extended period of time." (Tr. 226). X-rays in 2007 had indicated "medial compartment narrowing with sclerosis" and a "small suptratellar effusion." (Tr. 228). X-rays in indicated degenerative disc disease of the left knee . (Tr. 227). MRI of the left knee indicated a "complex tear" in the meniscus along with "chondromalacia patella…with denudation of the articular cartilage…and fraying of the articular cartilage" with a "moderate size joint effusion." (Tr. 229).

Plaintiff returned to work full-time as a crew leader at a fire and water restoration company from September of 2008 to February of 2009. (Tr. 185-86). He earned $6,996.64 in 2008 and $3,166.51 in 2009. (Tr. 145).

In October of 2008, Plaintiff was chastised by his treating neurologist, Dr. Martha Boulos, M.D., for failing to follow a narcotics contract. (Tr. 698-99). She explained that:

> The patient did have a urine [toxicology] screen on October 2, 2008, that demonstrated evidence of propoxyphene, which is not prescribed through any of oral medications and he admitted that he took some Darvocet from some of his friends. Hc did not have evidence of [opiods] in his system even though he is being prescribed morphine sulfate…twice a day and he received the #50 on September 26, 2008. Also, he had Duragesic 75 mg the #10 patches on September 15, 2008 and today in the office, he was not able to explain this, but asked for another chance to rectify the situation.

(Tr. 698). She "discuss[ed] with him that it is unacceptable that he does not follow the pharmacologic opioid agreement in the future and that I will give him a limited script for this month and observe if he will be respectful to this agreement." (Tr. 699). There is no record of any subsequent treatment at the Neurology Center.

Plaintiff presented to the emergency room at Pocono Medical Center on October 29, 2008 and December 11, 2008 for facial swelling and a facial laceration. (Tr. 416, 418, 420, 426). Plaintiff received narcotic pain medication. (Tr. 418, 420). In December of 2008, Plaintiff had dropped a knife on his face

while cutting drywall. (Tr. 426). At both visits, Plaintiff reported "no back pain" and ambulated with a normal gait. (Tr. 418, 420, 427-28).

In November of 2008, Plaintiff treated with Dr. Patel for a sore throat, and reported leg sensations that kept him from falling asleep. (Tr. 605). Physical examination showed no abnormalities. (Tr. 606). Plaintiff also treated with Dr. Richard Spinner, DPM, for foot pain. (Tr. 255). A letter by Dr. Spinner on February 3, 2009 indicated that injections had provided no pain relief. (Tr. 863).

Plaintiff asserted in his application that he stopped working on February 16, 2009 due to his disability. (Tr. 160). Aside from Dr. Spinner's letter, the transcript contains no record of treatment in February of 2009.

On March 26, 2009, Plaintiff followed-up with primary care physician Darshal B. Patal, M.D. (Tr. 617, 874). Plaintiff reported that his severe foot pain precludes him from functioning "when it is bad" and that he "has children at home and needs some pain control to help take care of them." (Tr. 617, 874). He had a history of insomnia and restless leg syndrome, which were both helped by medications. (Tr. 617, 874). His gait, neck, and back were normal without tenderness, although he had effusion, positive patellar sign, and positive McMurry's sign on his left knee. (Tr. 619, 876). Plaintiff was prescribed pain medication for osteoarthritis in his ankle, but instructed to take it "sparingly and only as needed." (Tr. 619, 876).

On March 29, 2009, Plaintiff presented to the emergency room at Pocono Medical Center for a dental infection and headache. (Tr. 432). Plaintiff was "ambulatory with a steady gait." (Tr. 433). Grasp strength in his hands was "strong." (Tr. 433). He reported "no joint pain" and "no back pain." (Tr. 433). He was prescribed Percocet and discharged home in stable condition. (Tr. 434-35).

On April 26, 2009, Plaintiff presented to Dr. Patel reporting pain in his legs, feet, and back and requested narcotic pain medication. (Tr. 629, 865). His gait, neck, and back were normal without tenderness, although he had effusion, positive patellar sign, and positive McMurry's sign on his left knee. (Tr. 631, 867). On June 23, 2009, physical examination showed no abnormalities, but he stated that pain medications were not helping. (Tr. 639-41). On July 31, 2009, Plaintiff reported a headache to Dr. Patel, along with "severe pain multiple areas. Needs increased [amount] of vicodin." (Tr. 650). Physical examination was normal. (Tr. 651). Dr. Patel "informed him that I will only give him max of 120 caps per month until he can see pain management." (Tr. 650).

On August 7, 2009, Plaintiff presented to the emergency room at Pocono Medical Center for a headache. (Tr. 440). Plaintiff reported that he took Percocet without relief for his chronic foot pain, but on examination he was "ambulatory with a steady gait," his "motor strength to all extremities [was] strong and equal," and he reported "no back pain." (Tr. 441-42). A CT scan of the head was normal.

(Tr. 449, 664). Plaintiff improved with pain medication and was discharged home in improved condition. (Tr. 444-45).

On September 11, 2009, an ALJ denied Plaintiff's first application for benefits under the Act, finding he could perform a range of sedentary work that would allow him to perform some jobs in the national economy. (Tr. 71, 75). The ALJ noted that Plaintiff and his wife had three children, and Plaintiff performed some child care for the youngest. (Tr. 76). The ALJ acknowledged the above-described imaging studies, along with:

> An MRI of the cervical spine performed on January 11, 2008 shows cervical disc desiccation; disc herniation at level C4-5, C5-6, and C6-7 with impingement of the thecal sac; spinal stenosis at the level of C4-7, C6-7 with mild flattening of the spinal cord; narrowing of the neural foramina at C6-7 bilaterally; and no evidence of spinal cord lesion. (Exhibit 7F/2).

(Tr. 77). However, a state agency medical consultant had opined that Plaintiff could perform a range of work, and the ALJ concluded that the objective medical evidence did not support Plaintiff's claims. (Tr. 77-79).

A letter from Dr. Spinner on September 30, 2009 states "[p]atient has been seen for the past year for chronic pain of the right foot. He has been evaluated by x-rays and MRI and has been treated by injections therapy, immobilization and orthoses. The treatment has not alleviated the symptoms." (Tr. 255, 673).

Plaintiff followed-up with Dr. Patel on September 30, 2009. (Tr. 674-76). Plaintiff reported back pain that limited his ability to sit, stand and walk and

demonstrated muscle spasm and decreased range of motion. *Id.* He also reported pain in his hips, feet, and knees. (Tr. 674). Examination also indicated "knee effusion on left, positive patellar apprehension sign on left and positive McMurray's sign on left, right ankle with tenderness to palpation." (Tr. 676).

Plaintiff underwent various imaging studies at Pocono Medical Center from September 24, 2009 through January 19, 2010. (Tr. 257-66). X-rays indicated "grossly abnormal" findings in the right foot "demonstrating loss of the arch of the foot and marked arthritic change involving the distal position of the talus and adjacent tarsal bone" that was "probably a congenital variant as the talus appears to be of abnormal configuration." (Tr. 261, 454, 920). Plaintiff's "left foot demonstrate[d] minimal but similar changes with arthritic narrowing and bony spurring involving the articulation of the distal talus and adjacent tarsal bone" that were "similar to the changes on the patient's right but much less marked." (Tr. 261, 454, 920). X-rays of Plaintiff's right ankle in September 2009 indicated "severe degenerative changes in the talonavicular joint" and mild subtalar arthritis. (Tr. 264, 453, 923). X-rays of the left ankle indicated "moderate degenerative changes in the talonavicular joint." (Tr. 264, 453). Follow-up X-rays in January of 2010 "again demonstrate[d] marked arthritic changes with huge bony spurs." (Tr. 266, 478, 914-15). There was no "marked interval change since earlier study." (Tr. 266, 478, 914-15). The left foot also showed "large bony spurs" with joint space

narrowing that extended anteriorly. (Tr. 266, 479). A CT scan of Plaintiff's right foot indicated "moderate osteoarthritis at the hindfoot and midfoot" with "joint space narrowing" and "osteophytic productive change." (Tr. 258, 459, 917). On October 7, 2009, MRI of Plaintiff's lumbar spine indicated degenerative changes with "moderate to severe central canal narrowing and narrowing and narrowing of the left neural foramen," a "small central disc protrusion," and a "lateral disc protrusion." (Tr. 457).

In September of 2009, Plaintiff presented as a new patient to Dr. Elmo Baldassari, DPM, for chronic foot pain and ankle weakness. (Tr. 668, 913). Plaintiff "states he is unable to do daily activities, employment, and states his quality of life has significantly decreased." (Tr.668, 913). Examination indicated:

> [P]aresthesia and burning to the feet, temperature feet cool, pedal pulses faint, edema noted, decreased hair growth. Dermatological exam: onychomycosis 1-10 with fungus, thickness, elongation, pain. Orthopedic: weakness right ankle on range of motion compared to left ankle. Painful subtalar joint with limited motion. This is of the right lower extremity.

(Tr. 913). Dr. Baldassari reviewed Plaintiff's imaging assessed Plaintiff to have "radiculopathy, loss of strength right lower extremity, a coalition, painful right leg, painful left foot and ankle." (Tr. 913). An MRI of Plaintiff's ankle from February of 2009 indicated advanced degenerative changes with edema, fluid, and other abnormalities. (Tr. 926). In October of 2009, Dr. Baldassari ordered more imaging studies and indicated that Plaintiff may be a candidate for surgery. (Tr. 912).

On January 7, 2010, Plaintiff presented to the emergency room at Pocono Medical Center after falling down stairs and injuring his right hip. (Tr. 463). His gait, motor, and sensory examinations were "normal." (Tr. 464). He had normal range of motion in his neck. (Tr. 464). Plaintiff was able to ambulate and bear weight and reported "no back pain." (Tr. 464). He reported prior surgeries in both hips. (Tr. 466).  His hip was tender with bruising, but had full range of motion. (Tr. 464). X-rays of the hip showed degenerative change in the lower lumbar spine, sacroiliac area, both hips, and "about [the] symphysis pubis," but were negative for fracture. (Tr. 469).  He was diagnosed with a hip contusion, and he was discharged home (Tr. 464, 466).

On January 9, 2010, Plaintiff presented to the emergency room at Pocono Medical Center complaining of pain in both feet over the previous few days. (Tr. 473). He was "ambulatory with a steady gait," with normal range of motion, normal motor examination, and normal sensory examination. (Tr. 473-74). He was discharged home with a prescription for Vicodin. (Tr. 474-75).

 By January 15,  2010, Plaintiff's physical examination with Dr. Baldassari was normal, except for pain, and he "recommend[ed] conservative treatment first." (Tr. 910-11). Plaintiff cancelled his appointments with Dr. Baldasari on March 19, 2010 and October 19, 2010 and no-showed for his appointment on October 22, 2010. (Tr. 910).

Plaintiff was hospitalized on April 28, 2010 for gastroenteritis and history of adrenal insufficiency. (Tr. 484). He was discharged with a prescription for Zofran. (Tr. 489). He returned the next day with the same complaints, and was discharged with a prescription for Omeprazole. (Tr. 509). At both visits, he reported "no back pain" and examination indicated normal range of motion in the neck, no tenderness to palpation in the back, and normal motor and sensory function. (Tr. 485-86, 504-05). On May 10, 2010, Plaintiff followed-up with Dr. Harris following his hospitalization, who noted that he "immediately responded to iv steroids and iv fluids…has done well and is on amoxicillin for teeth being pulled this Friday." (Tr. 290). Plaintiff was continuing to take testosterone injections and had normal energy and normal libido. (Tr. 290). His weight was normal. (Tr. 290). He continued to report a difficult time sleeping. (Tr. 292). He reported foot pain that was a nine on a ten point scale. (Tr. 295-96). Plaintiff's physical examination was normal, and indicated that he was "healthy," in "no distress," and had a normal gait. (Tr. 293).

Plaintiff was hospitalized at Pocono Medical Center on June 10, 2010 for enteritis after experiencing bouts of vomiting. (Tr. 388). He was "ambulatory with a steady gait" and was at "no risk for fall." (Tr. 389). Plaintiff reported "no back pain." (Tr. 390). He was discharged home. (Tr. 390). Plaintiff was hospitalized on June 14, 2010 at Pocono Medical Center for weakness, confusion, and anxiety. (Tr.

398). He explained that he was continuing to experience nausea and vomiting, and had not improved since his earlier hospitalization. (Tr. 399). Plaintiff was treated with IV fluids, discharged with a prescription and was ambulating without assistance. (Tr. 400). Physicians discussed the possibility of narcotic withdrawal. (Tr. 402-03).

Plaintiff was hospitalized from September 2, 2010 to September 4, 2010 and again from September 7, 2010 to September 8, 2010 for "adrenal crisis secondary to gastroenteritis." (Tr. 318, 519, 522). He was "treated with aggressive hydration and IV steroid" and his symptoms improved. (Tr. 520, 522). On September 13, 2010, Plaintiff followed-up with Dr. Harris, who noted he had been hospitalized twice for adrenal crises. (Tr. 306). Dr. Harris noted that he immediately responded to treatment. (Tr. 306). He continued to report difficulty sleeping and snoring. (Tr. 309). Dr. Harris noted no abnormalities on physical examination and observed Plaintiff was "healthy," in "no distress," and walked with a "normal gait." (Tr. 309).

Plaintiff was hospitalized from October 24, 2010 to October 25, 2010 for adrenal crisis. (Tr. 524). He was treated with IV fluids and steroids, and reported "feeling well" and "back to his normal state of health." (Tr. 525). He was discharged with instructions to follow-up with Dr. Harris. (Tr. 525). Treating providers wanted him to "stay in the hospital, however, he reporte[d] his wife

recently had surgery today and she's returning home from the hospital…up in Scranton" and filed a request to be discharged home, which was granted. (Tr. 525).

On November 14, 2010, Plaintiff presented to the emergency room at Pocono Medical Center complaining of vomiting. (Tr. 530). Plaintiff reported joint pain, but "no back pain." (Tr. 524). His gait, motor, and sensory function were normal with no tenderness in his back and full range of motion in his neck. (Tr. 535). He was diagnosed with acute bronchitis, gastroenteritis and acute viral syndrome and discharged with prescriptions for Zithromax and Zofran. (Tr. 537, 539).

Plaintiff treated with neurologist Dr. Roderigo Estonilo, M.D. monthly from November of 2009 through December of 2010. (Tr. 843-59). Plaintiff reported foot and back pain and Dr. Estonilo prescribed narcotic pain medications. *Id.* However, Dr. Estonilo's progress notes are all handwritten and, aside from high blood pressure and an abnormal EMG in his upper extremities, no objective findings are discernable. *Id.*

On December 2, 2010, Plaintiff's wife, Michelle Kirk, submitted a function report. (Tr. 184). She indicated problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, and using his hairs, along with mental limitations. (Tr. 182). She reported Plaintiff spends most of his day in bed, and "no longer does anything but watch [television and] occasionally draw." (Tr.

177, 181). She reported problems sleeping and problems with personal care. (Tr. 178). She indicated that he was becoming forgetful. (Tr. 179). She reported that he used to cook dinner four nights a week, but could no longer prepare more than simple meals three times per week. (Tr. 179). She noted that he performed some household chores, but she had to "plead with him to help; he has no motivation." (Tr. 179). She indicated that he could ride in cars and drive, but only cars with manual transmissions. (Tr. 180). She reported that he uses a cane. (Tr. 183).

On December 5, 2010, Plaintiff submitted a function report. (Tr. 200). He indicated problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, but not using his hairs, along with mental limitations. (Tr. 198). He reported that he "sit[s] [and] watch[es] [television] all day." (Tr. 193). He otherwise reported the same limitations and functions as his wife, who helped him fill out the form. (Tr. 193-200).

On December 23, 2010, Dr. Kurt Maas, M.D., reviewed Plaintiff's filed and opined that Plaintiff could perform a range of light work with postural and other limitations. (Tr. 84-88). He acknowledged Plaintiff's abnormal EMG showing carpal tunnel and his abnormal imaging studies of the ankle, knee, and spine, but indicated that, while these impairments caused some limitations, they were not work-preclusive. (Tr. 86). He opined that Plaintiff was only partially credible based on his activities of daily living described in his function report and his

medication treatment. (Tr. 87). He cited Plaintiff's normal gait, reflexes, and sensation. (Tr. 86).

On December 28, 2010, state agency psychologist Dr. Anthony Galdieri, Ph.D., reviewed Plaintiff's file and opined that his mental impairments caused no restriction in activities of daily living, social functioning, or episodes of decompensation, and mild limitation in maintaining concentration, persistence, and pace, and were therefore non-severe (Tr. 885-97).

### b.    Evidence submitted after Dr. Maas's opinion

On February 1, 2011, Dr. Patal issued a letter indicating that Plaintiff was "totally and permanently disabled due to his medical problems and…cannot sustain any gainful employment now or in the future." (Tr. 900). Dr. Patal noted Plaintiff had "developed many complications from chronic steroids needed to treat his disease. He has severe chronic dally pain which has led to a huge psychological strain."  (Tr. 899). He also cited Plaintiff's depression, anxiety, hospitalizations, and treatment with specialists. (Tr. 899).

In April of 2011, Dr. Baldassari noted that Plaintiff "wants to have surgical intervention. I explained to him very clearly that surgery may not be the answer to his questions. He may have chronic pain and discomfort. He wants to try it." (Tr. 931). In May of 2011, Dr. Baldassari indicated he was a candidate for surgery, although it might not relieve his pain. (Tr. 1011).

Plaintiff continued treating with Dr. Estonilo monthly for medication management and continued to report pain. (Tr. 934-48). In April of 2011, Plaintiff reported that his "wife ends up driving more" and that he could not get out of bed twice a week. (Tr. 935).

On June 25, 2011, Dr. Estonilo drafted an RFC assessment. (Tr. 958-65). He identified Plaintiff's diagnoses as "severe, chronic joint pain" with a comorbidity of adrenal dysfunction. (Tr. 958). For positive clinical findings, he cited "endocrinology evaluation," "joint pain" in his back, leg, ankle, and foot, and "prolonged use of narcotics [with] very poor response (no evidence of drug misuse, abuse nor diversion)." (Tr. 958). Dr. Estonilo left the portion for "laboratory and diagnostic tests which demonstrate and/or which [his] diagnosis" blank. (Tr. 959). He opined that activity, repetitive activities of daily living, sitting, standing, and other factors lead to Plaintiff's pain. (Tr. 960). He opined that Plaintiff suffered from severe pain and moderate fatigue, but also opined that he had "been able to completely relieve the pain with medication without unacceptable side effects." (Tr. 960). He then opined that Plaintiff could sit for only two hours out of an eight hour day and stand or walk "0-1" hours out of an eight hour day. (Tr. 960). He opined that Plaintiff had to continuously get up and move around. (Tr. 960). He opined that Plaintiff had "significant limitations in doing repetitive reaching, handling, fingering, or lifting" and had "marked" limitations, defined as

"essentially precluded," in using the upper extremities for grasping, turning, or twisting objects; using his hands or fingers for fine manipulation; and using his arms for reaching. (Tr. 961). He opined that Plaintiff's symptoms would not increase if he were placed in a competitive work environment, but that his condition would "interfere with the ability to keep the neck in a constant position (e.g. looking at a computer screen, looking down at the desk)." (Tr. 962). He opined that Plaintiff would not need to take "unscheduled breaks to rest at unpredictable intervals during an 8-hour working day." (Tr. 963). When how often Plaintiff would be absent from work, he checked every available option: "more than three times a month," "about two to three times a month," "about once a month," and "less than once a month." (Tr. 964).

On July 18, 2011, X-rays of Plaintiff's ankles indicated deformities and arthritic changes, but there was no interval change since the X-rays in January of 2010. (Tr. 1012). The next day, Dr. Baldassari confirmed that surgery would be appropriate. (Tr. 1010). Plaintiff was requesting narcotics, but Dr. Baldassari refused to prescribe them until after the surgery. (Tr. 1010). At a preoperative screening on August 5, 2011, Plaintiff was using a cane and reported pain in his "ankle, foot, hips." (Tr. 1018). He had mild to moderate paralumbral muscle spasm, a normal neck examination, and no focal motor or sensory deficits. (Tr. 1020). X-rays of his chest were normal. (Tr. 1014).

On September 2, 2011, Dr. Baldassari performed a talonvavicular joint arthodesis on Plaintiff's right foot. (Tr. 1005). Dr. Baldassari instructed him to "be non-weight bearing in the postoperative course with crutches or walker." (Tr. 1008). At a post-operative follow-up five days later, Plaintiff was "doing well" and a "lower leg splint was applied to the right lower extremity." (Tr. 1004). On September 16, 2011, Plaintiff was placed in a non-weight bearing cast, provided with a fracture boot, and instructed to "continue non-weight bearing." (Tr. 1003). On October 13, 2011, Plaintiff's cast was removed, X-rays were "within normal limits," and he was instructed to "continue non-weight bearing." (Tr. 1001).

On November 1, 2011, Plaintiff had inpatient psychiatric hospitalizations after he assaulted his family, strangling his wife and punching his son in the face. (Tr. 970-90). He and his wife attributed his actions to his steroid and pain killer medications. (Tr. 984). He reported pain in his feet, knees, and hips, but not his back or upper extremities. (Tr. 984). Plaintiff's wife took out a Protection from Abuse order against him because she feared he would kill her. (Tr. 984). He was released from hospitalization on November 7, 2011. (Tr. 984).

The ALJ entered a news article into the record showing that Dr. Estonilo had been arrested for improperly prescribing pain medication in July of 2011. (Tr. 219-20). Plaintiff's counsel subsequently submitted a medication list to the ALJ

that showed that all of Plaintiff's medications were prescribed by other providers as of December 15, 2011. (Tr. 993-996).

On December 6, 2011, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 44). The ALJ noted that he had provided Plaintiff's counsel with evidence of Dr. Estonilo's arrests, and Plaintiff's counsel acknowledged receipt. (Tr. 44-47). Plaintiff testified that he had a driver's license. (Tr. 48). He testified that he stopped working in August of 2009. (Tr. 49). He testified that he had pain in his shoulders, back, hips, and feet that was constant along with tingling and numbness in his hands. (Tr. 54). He reported that he could handle his personal care but, aside from dishes, his wife handles the household chores and shopping. (Tr. 50). He testified that foot pain caused problems sleeping. (Tr. 52). He reported that he could stand for no more than fifteen minute at a time and could sit for no more than five or ten minutes at a time. (Tr. 52). He indicated that he had been using a cane since a month before his surgery, and might need it for the rest of his life. (Tr. 54). He testified that his primary care physician was prescribing his medications and that pain medications caused drowsiness. (Tr. 53). He testified that he "stay[ed] in bed a lot" to alleviate his symptoms. (Tr. 53). He explained that he napped for three to four hours a day. (Tr. 55). He acknowledged that he had not had "any difficulty with his adrenals since his hospitalizations in 2010. (Tr. 53).

Plaintiff's wife appeared and testified. (Tr. 58). She testified that Plaintiff understates his problems to his treating providers. (Tr. 58).

### c.    ALJ Findings

The ALJ issued the decision on February 23, 2012. (Tr. 37). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 17, 2009, the date after the prior ALJ decision, and was insured through June 30, 2014. (Tr. 30). At step two, the ALJ found that Plaintiff's degenerative disc disease and degenerative joint disease of the lumbar spine, degenerative joint disease of the right foot and bilateral ankles, status post right foot talonavicular joint arthrodesis and degenerative joint disease of the left knee and bilateral hips obesity were medically determinable and severe. (Tr. 30). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 32). The ALJ found that Plaintiff had the RFC to perform:

> [A] narrow range of light work (treated as sedentary work herein);
> namely, lifting and carrying 20 pounds occasionally and 10 pounds
> frequently, with 2 hours of standing and walking, and 6 to 8 hours of
> sitting in an 8-hour workday with a sit/stand option at the will or
> direction of the individual. The claimant can perform occasional
> climbing, balancing and stooping, never on ladders, kneeling and
> crouching or crawling. He must avoid temperature extremes,
> humidity, vibration and hazards. He is limited to simple routine tasks
> and low stress as defined as only occasion[al] decision making and
> only occasion[al] changes in the work setting.

(Tr. 32). At step four, the ALJ found that Plaintiff could not perform his past relevant work. (Tr.  35). At step five, the ALJ relied on the vocational expert

testimony and found that Plaintiff could perform other work in the national economy. (Tr. 35). Accordingly, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 36).

## VI.  Plaintiff Allegations of Error

### a. Credibility

Plaintiff asserts that the ALJ erred in assessing his credibility. (Pl. Brief at 8-12). When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)...that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing 20 C.F.R. § 404.1529(c)).

Here, the ALJ found that Plaintiff's subjective complaints were not fully credible:

> The evidence of record simply does not support the claimant's alleged level of incapacity.
>
> On September 2, 2011, the claimant underwent a right foot talonavicular joint arthrodesis (Exhibit B20F/9). The treatment records from Elmo Baldassari, D.P.M. only go to October 2011. Dr. Baldassari reports in his treatment notes dated October 13, 2011 that the claimant is to continue non-weight bearing, however, the records do not reflect the actual foot treatment through the date of hearing which was 3 months post surgery. By the time of the hearing the claimant was ambulating with a cane, thus the non-weight bearing restriction in the records had changed.
> …
> …Most examinations are remarkable for being unremarkable.
>
> In August 2011, Dr. Khan's examination was normal including, motor, strength and notes only a mildly antalgic gait with hip range of motion limitations.
>
> A physical examination by The Geisinger Medical Center Endocrinologist Ronald Harris, M.D. on September 13, 2010 was normal (Exhibit B7F/54). Physical examinations at the Pocono Medical Center were also normal (Exhibit B8F). Dr. Darshan Patel's examination notes are normal on October 10, 2009 except for mild to moderate spasm and subjective tenderness in the paralumbar muscles. The claimant had a negative straight leg raise with only "some limitation of flexion" and in the extremities, he notes knee effusion on left, positive patellar apprehension testing and McMurray's sign on the left, right ankle tenderness. However, Dr. Patel found the claimant completely normal neurologically with no focal motor/sensory deficits and his gait is normal (Exhibit B9F/128). Dr. Patel's 2010 notes including then most recent note in record on December of 2010 note, the examination findings are absolutely normal with no deficits noted in the objective findings (Exhibit B9F/283).

…[A] review of all of his objective findings in 2010 reflects normal findings…

…

In making a determination concerning the claimant's residual functional capacity, the undersigned also considered the opinion of the Kurt Maas, M.D. the Medical Consultant for the Disability Determination Service (DDS) pursuant to Social Security Ruling 96-6p. Dr. Maas opined that the claimant has the residual functional capacity for work at the light exertional level (Exhibit B3A15 -6). The undersigned agrees with this finding since it is mostly consistent with the objective findings that show the claimant was, and is capable of work. However, in giving the claimant the benefit of the doubt and acknowledging his most recent surgery, the undersigned further finds that he is slightly more limited than the Dr. Maas opined, limiting him to work at the light exertional level with standing and walking which have been reduced to address the later limitation due to the later operation on his right foot. The undersigned has included a sit/stand option to address his need to change position due to his back and hip impairment. Postural, mental and environmental limitations have also been included in the claimant's residual functional capacity that address the limitations imposed by his severe and non severe impairments, subjective complaints and medication side effects.

(Tr. 32-34). In other words, the ALJ relied on Plaintiff's limited post-surgical treatment and objective medical evidence, including Dr. Maas's opinion. (Tr. 32-34).

Plaintiff asserts that the ALJ erred in relying on a lack of objective evidence to conclude that his claims of disabling impairments were not fully credible. (Pl. Brief at 9-12). Plaintiff cites specific he contends support his credibility, specifically:

- His diagnoses of "adrenogenital disorders; osteoporosis; long term use of corticosteroids; hip joint replacement status; osteoarthritis – ankle; int derangement of the knee; depressive

disorder; anxiety; pruritic disorder; and persistent insomnia."
(Pl. Brief at 9-10) (Citing Tr. 761).

- Plaintiff's September 24, 2009 foot and ankle X-rays. (Pl. Brief at 10-11) (citing 258, 261, 264).
- Dr. Spinner's September 30, 2009 letter. (Pl. Brief at 10-11) (citing Tr. 255).
- Plaintiff's January 12, 2010 right foot CT scan (Pl. Brief at 10-11) (citing Tr. 258).
- Plaintiff's treatment and hospitalizations for adrenal crisis (Pl. Brief at 11-12) (citing Tr. 519, 522, 524)
- Plaintiff's bone density scan showing osteoporosis. (Pl. Brief at 11-12) (citing Tr. 703-04)
- Plaintiff's October 2009 spine MRI (Pl. Brief at 11-12) (citing Tr. 484).
- Plaintiff's January 10, 2010 hip MRI. (Pl. Brief at 11-12) (citing Tr. 409).
- Plaintiff's treatment with medications (Pl. Brief at 10-11) (citing Tr. 855, 944, 1011).
- Plaintiff's subjective complaints of pain, sleeping problems, and/or numbness on November 10, 2009; December 1, 2009; July 5, 2010; August 11, 2010; September 17, 2010; October 21, 2010; November 17, 2010; December 16, 2010. (Pl. Brief at 10-11) (citing Tr. 849-50, 852, 855, 858-59, 939, 941-42, 944).

Plaintiff asserts that the ALJ was forced to "play doctor" in order to interpret the objective medical evidence. (Pl. Reply at 2).

However, all of the above-described evidence was presented to the state agency prior on or before December 21, 2010 and reviewed by Dr. Maas on December 23, 2010. (Tr. 83-88). Dr. Maas is a state agency physician. *Id.* State agency physicians are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i). Dr. Maas acknowledged Plaintiff's hospitalizations,

his abnormal EMG showing carpal tunnel, and his abnormal imaging studies of the ankle, knee, and spine, but indicated that, while these impairments caused some limitations, they were not work-preclusive. (Tr. 86). He opined that Plaintiff was only partially credible based on his activities of daily living described in his function report and his medication treatment. (Tr. 87). He cited Plaintiff's normal gait, reflexes, and sensation. (Tr. 86). Thus, he opined that Plaintiff could perform a range of light work with postural and other limitations. (Tr. 84-88).

Plaintiff writes that the ALJ "cited no evidence of authority that such objective findings do not support Mr. Kirk's limitations." (Pl. Reply at 2). However, the ALJ explicitly cited Dr. Maas's opinion that such objective findings do not support his limitations. (Tr. 34). The objective evidence cited by Plaintiff demonstrates that he has multiple impairments and abnormalities, but does not establish the impact those impairments and abnormalities have on his work-related function. Dr. Maas reviewed the objective evidence, and opined that Plaintiff did not suffer from work-preclusive limitation, despite his impairments and abnormalities. Thus, the ALJ was not required to independently review this evidence or make speculative inferences from the medical records. *See Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985).

Plaintiff has not challenged the ALJ's reliance on Dr. Maas's opinion; in fact, Plaintiff never mentions Dr. Maas's opinion. (Pl. Brief, Pl. Reply). Plaintiff

asks the court to reweigh the same medical evidence reviewed by Dr. Maas and reach a different conclusion. However, "[n]either the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3dCir. 2011) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations") (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The question is not whether Plaintiff demonstrated some findings that could support a finding of disability. The question is whether the ALJ reasonably concluded that the objective medical evidence failed to support his claims. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Here, the ALJ reasonably concluded, with the aid of Dr. Mass's opinion, that the objective evidence failed to support his claims. This was a proper rationale to find Plaintiff less than fully credible. SSR 96-7p.

Plaintiff's subjective complaints of pain do not constitute objective medical evidence that supports his credibility:

> [T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion. *Craig v. Chater,* 76 F.3d 585, 590 n. 2 (4th Cir.1996). An ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted. *Fair v. Bowen,* 885 F.2d 597, 605 (9th Cir.1989) ("The ALJ thus disregarded Dr. Bliss' opinion because it was premised on Fair's own subjective complaints,

which the ALJ had already properly discounted. This constitutes a specific, legitimate reason for rejecting the opinion of a treating physician.").

*Morris v. Barnhart*, 78 Fed.Appx. 820, 824-25 (3d Cir. 2003). Thus, Plaintiff's subjective complaints of pain do not provide a basis to conclude that the ALJ's credibility determination lacks substantial evidence.

With regard to Plaintiff's treatment with medication, Dr. Maas concluded that Plaintiff's treatment record undermined the credibility of his claims. The ALJ assigned great weight to the opinion of Dr. Maas, so the Court can reasonably discern that the ALJ agreed with his assessment of Plaintiff's treatment record. *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.,* 730 F.3d 291, 305 (3d Cir. 2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis" and instead must only "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."); *Hur v. Comm'r Soc Sec*., 94 F. App'x130, 133(3d Cir. 2004) ("There is no requirement that the ALJ discuss in its  opinion every tidbit of evidence included in the record"). Plaintiff acknowledges that the "ALJ states in several portions of her decision that failure to seek medical treatment was a basis for her adverse credibility finding." (Pl. Reply at 4).  This is

an accurate characterization and a proper rationale to find Plaintiff less than fully credible.

Plaintiff's medication treatment record shows that, in July of 2008, Dr. Miric noted that Plaintiff "discontinued Effexor because he felt it was causing the fatigue and just tried the Prozac by himself and escalated properly from 20 mg to 80 mg in 4 weeks and he says that this medication feels well and his depression is much better. I spoke to Troy that this is not the proper way to take the medicine and he should not choose to take medicine without doctor's prescriptions and advice." (Tr. 233). Plaintiff returned to work in September of 2008. In October of 2008, Plaintiff was chastised by his treating neurologist, Dr. Martha Boulos, M.D., for failing to follow a narcotics contract. (Tr. 698-99). She explained that:

> The patient did have a urine [toxicology] screen on October 2, 2008, that demonstrated evidence of propoxyphene, which is not prescribed through any of oral medications and he admitted that he took some Darvocet from some of his friends. Hc did not have evidence of [opiods] in his system even though he is being prescribed morphine sulfate…twice a day and he received the #50 on September 26,2008. Also, he had Duragesic 75 meg the #10 patches on September 15,2008 and today in the office, he was not able to explain this, but asked for another chance to rectify the situation.

(Tr. 698). She "discuss[ed] with him that it is unacceptable that he does not follow the pharmacologic opioid agreement in the future and that I will give him a limited script for this month and observe if he will be respectful to this agreement." (Tr. 699). There is no record of any subsequent treatment at the Neurology Center.

Plaintiff established care with a different neurologist, Dr. Estonilo, who prescribed him pain medication at monthly visits from November of 2009 to December of 2010. Plaintiff asserts that he stopped working on February 16, 2009 as a result of his medical condition, but there are no medical records showing treatment in February of 2009. Plaintiff began requesting pain medication from Dr. Patel on March 26, 2009, who acquiesced but instructed him to use it sparingly. Plaintiff presented to Pocono Medical Center on March 29, 2009, complaining of pain, and received another prescription for narcotic pain medication.

Plaintiff requested more pain medication from Dr. Patel in April of 2009, and again on July 31, 2009, at which point Dr. Patel "informed him that I will only give him max of 120 caps per month until he can see pain management." (Tr. 650). A week later, on August 7, 2009, Plaintiff presented to the emergency room complaining of pain and received narcotic medication at the hospital along with another prescription for narcotic pain medication on discharge.

Shortly thereafter, Plaintiff began treating with Dr. Estonilo, who prescribed him pain medications. Dr. Baldassari recommended conservative treatment in January of 2010, and Plaintiff cancelled or no-showed to all of his remaining appointments in 2010. Plaintiff continued presenting to the emergency room at Pocono Medical Center in 2010 complaining of pain and receiving narcotic pain

medication, and in June of 2010, physicians opined that his gastrointestinal symptoms may be caused by narcotics withdrawal.

Plaintiff asserts that the ALJ erred in assessing his treatment because the ALJ did not consider whether "further treatment would benefit him." (Pl. Reply at 5) (citing SSR 96-7). Plaintiff asserts that there is no indication that a physician recommended more intensive treatment. (Pl. Brief at 6). However, the record shows that Dr. Baldassari instructed Plaintiff to follow-up every six months, and Plaintiff cancelled his appointments in 2010. *Supra*. The treatment record also shows noncompliance, and Plaintiff does not provide any explanation for Plaintiff's noncompliance. Thus, Plaintiff's treatment with medications does not provide a basis to conclude that the ALJ's credibility determination lacks substantial evidence.

Plaintiff also cited some evidence from after Dr. Maas's opinion:

- Plaintiff's July 18, 2011 right ankle MRI. (Pl. Brief at 10-11) (citing Tr. 1012).
- Plaintiff's September 2011 ankle surgery (Pl. Brief at 10-11) (citing Tr. 1005).
- Plaintiff's continued medication treatment. (Pl. Brief at 10-11) (citing Tr. 855, 944, 1011).
- Plaintiff's subjective complaints of pain on April 30, 2011, May 17, 2011 and July 19, 2011. (Pl. Brief at 10-11) (citing Tr. 849-50, 852, 855, 858-59, 935, 939, 941-42, 944, 996, 1010-11).

With regard to Plaintiff's continued medication treatment, as discussed above, Dr. Maas properly found that Plaintiff's medication treatment prior to

December of 2010 undermined his credibility. Plaintiff's medication treatment record did not change significantly after Dr. Maas's opinion; he continued treating only with medications and requested narcotics from Dr. Baldassari when narcotic treatment was inappropriate. Thus, Plaintiff's treatment with medication after Dr. Maas's opinion does not provide basis to disturb the ALJ's credibility decision. SSR 96-7p.

With regard to Plaintiff's July 2011 ankle MRI, the Court notes that it specifically indicated "no significant interval change" since the previous MRI reviewed by Dr. Maas. (Tr. 1012). Consequently, it contains no new objective finding and does not provide basis to disturb that ALJ's credibility assessment. Plaintiff's continued complaints of pain do not constitute objective medical evidence that supports his credibility. *Supra.*

Plaintiff asserts that the ALJ was required to afford "great weight" to his complaints and could not disregard them absent contradictory medical evidence. (Pl. Reply at 7). First, the ALJ relied on contradictory medical evidence, Dr. Maas's opinion. Second, Plaintiff misstates the law. When there is objective evidence of underlying abnormalities that could cause Plaintiff's claimed limitations, his claims should be "seriously considered." *See Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). If there is objective evidence of an actual limitation, such as decreased sight or range of motion, they should be given great

weight. *Id.* As discussed above, Plaintiff produced objective evidence of his underlying impairments, and so his complaints were entitled to serious consideration, but they were not entitled to great weight.

In sum, Dr. Maas reviewed virtually all of the medical evidence cited by Plaintiff and concluded that the objective findings did not support his disabling complaints. Plaintiff cites to a few pieces of evidence that were not reviewed by Dr. Maas, but there were no new objective findings. Plaintiff does not mention Dr. Maas or provide any reason to conclude that the ALJ erred in relying on Dr. Maas's assessment. A reasonable mind could accept the objective medical evidence, as interpreted by Dr. Maas, and medication treatment record, as noted by Dr. Maas, as sufficient to conclude that Plaintiff was not fully credible. Substantial evidence supports the ALJ's credibility determination, the Court finds no merit to this allegation of error, and does not recommend remand on these grounds.

**b. RFC Assessment**

Plaintiff cites the same testimony and medical evidence to argue that the ALJ should have included additional limitations in the RFC. (Pl. Brief at 13-16). However, as discussed above, the ALJ properly considered Dr. Maas's evaluation of the objective evidence and relied on Dr. Maas's opinion to identify the limitations in the RFC. *Supra.* The ALJ properly found that Plaintiff's testimony

was not fully credible. *Supra.* The Court finds no merit to this allegation of error,

and does not recommend remand on these grounds.

### c. VE Hypothetical

Plaintiff asserts that the ALJ hypothetical was incomplete because the RFC

was incomplete. (Pl. Brief at 16-17). As the Third Circuit has explained:

> [O]bjections to the adequacy of hypothetical questions posed to a
> vocational expert often boil down to attacks on the RFC assessment
> itself. That is, a claimant can frame a challenge to an ALJ's reliance
> on vocational expert testimony at step 5 in one of two ways: (1) that
> the testimony cannot be relied upon because the ALJ failed to convey
> limitations to the vocational expert that were properly identified in the
> RFC assessment, or (2) that the testimony cannot be relied upon
> because the ALJ failed to recognize credibly established limitations
> during the RFC assessment and so did not convey those limitations to
> the vocational expert. Challenges of the latter variety (like
> Rutherford's here) are really best understood as challenges to the RFC
> assessment itself.

*Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005). Here, as discussed

above, substantial evidence supports the ALJ's RFC assessment. *Supra.* Thus, the

Court finds no merit to this allegation of error and does not recommend remand on

this ground.

### d. Assignment of Weight to the Medical Opinions

For the first time, Plaintiff asserts in his Reply that the ALJ erred in rejecting

Dr. Estonilo's medical opinion. "Medical opinions are statements from physicians

and psychologists or other acceptable medical sources that reflect judgments about

the nature and severity of your impairment(s), including your symptoms, diagnosis

and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Opinions can come from various sources, including treating physicians, examining physicians, and non-examining physicians. 20 C.F.R. §§ 404.1527(c)(1)-(2). "Regardless of its source, [the Commissioner] will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). If a treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2). Here, Dr. Estonilo's opinion was inconsistent with other substantial evidence in the record, specifically Dr. Maas's opinion, so it was not entitled to controlling weight. (Tr. 88).

When the Commissioner does not give a treating "opinion controlling weight under paragraph (c)(2) of this section, [the Commissioner] consider[s] all of the following factors in deciding the weight we give to any medical opinion." 20 C.F.R. § 404.1527(c). Specifically, "[w]hen [the Commissioner does] not give the treating source's opinion controlling weight, [the Commissioner] appl[ies] the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of [Section 404.1527], as well as the factors in paragraphs (c)(3) through (c)(6) of [Section 404.1527]in determining the weight to give the opinion." 20 C.F.R. § 404.1527(c)(2).

Pursuant to 20 C.F.R. §404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." Pursuant to 20 C.F.R. §404.1527(c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Pursuant to 20 C.F.R. §404.1527(c)(5), more weight may be assigned to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

A non-treating opinion may be assigned more weight than a treating opinion. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (state agency physicians are "highly qualified" and "experts" in social security disability evaluation.). The Regulations provide that, "[w]hen the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if *it* were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i) (emphasis added). Thus, when a treating source opinion is not given controlling weight, it does not trump all opinions from a nontreating source. It merely receives more weight than it otherwise would if it were authored by a non-treating physician. All other factors being equal, a treating source opinion will receive greater weight. However, if the

examining or non-examining opinion is better supported, more consistent with

evidence, or authored by a specialist, then it may be entitled to greater weight than

a treating opinion. As the Third Circuit explained in *Jones v. Sullivan*, 954 F.2d

125 (3d Cir. 1991):

> Jones next argues that the law of this Circuit required the ALJ to
> adopt the judgment of Jones's treating physicians, who opined that
> Jones's illnesses prevent him from maintaining gainful employment
> and cause him severe pain. Jones claims that the ALJ substituted the
> ALJ's own lay observations of Jones's condition for the findings of
> Jones's treating physicians, thus violating *Frankenfield v. Bowen*, 861
> F.2d 405 (3d Cir.1988). In *Frankenfield*, we established that, in the
> absence of contradictory medical evidence, an ALJ in a social security
> disability case must accept the medical judgment of a treating
> physician. However, the opinions offered by Jones's treating
> physicians were conclusory and unsupported by the medical evidence,
> and failed to explain why ailments that had plagued Jones for decades
> did not incapacitate him until 1987. Further, these opinions were not
> uncontradicted. After Jones applied for reconsideration of the initial
> rejection of his claim, two physicians in the state agency evaluated the
> medical findings of Jones's treating physicians and concluded that
> those findings did not reveal any condition that would preclude
> gainful employment. In light of such conflicting and internally
> contradictory evidence, the ALJ correctly determined that the
> opinions of Jones's treating physicians were not controlling. *See, e.g.*,
> *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir.1990); *Newhouse v.
> Heckler*, 753 F.2d 283, 286 (3d Cir.1985).

*Id*. at 128-29; *see also Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (An

ALJ "may choose whom to credit" when a treating physician opinion conflicts

with a non-treating physician opinion, and may "reject 'a treating physician's

opinion outright…on the basis of contradictory medical evidence.'") (quoting

*Plummer,* 186 F.3d at 429)); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361

(3d Cir. 2011) ("Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records, *see, e.g.,* 20 C.F.R. § 404.1527(d)(1)-(2), '[t]he law is clear ... that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity'") (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n. 2 (3d Cir.2011)).

The ALJ agreed with Dr. Maas's opinion because it was "mostly consistent with the objective findings," although the ALJ gave Plaintiff the benefit of the doubt and found him more limited than Dr. Maas's assessment. (Tr. 34). The ALJ assigned "little" weight to Dr. Estonilo's opinion because:

> Again, as with Dr. Patel's opinion there are no supporting signs or laboratory findings to support the opinion. Further, his actual examination notes are hand written and fail to set forth any objective deficits to support his opinion (Exhibits BIOF & BI6F). Adding an additional issue of undermining the credibility of this physician is his arrest this past summer, only 2 months after issuing this opinion, for illegally prescribing pain killers. Neither Dr. Estonilo's records nor the record as whole support his opinion herein. Little weight is afforded this opinion as it is clearly not well supported in the evidence of record.

(Tr. 34).

Plaintiff does not address the ALJ's assessment of Dr. Estonilo's arrest for illegally prescribing pain kills. (Pl. Reply). Plaintiff does not address the ALJ's conclusion that Dr. Estonilo's opinion was inconsistent with other "evidence of record." (Pl. Reply). Plaintiff merely addresses Dr. Estonilo's treatment notes, and argues that the ALJ was not entitled to rely on a lack of discernible objective

findings in the notes. (Pl. Reply).

Plaintiff assets that relying Dr. Estonilo's failure to "document any objective deficits" constitutes an "impermissible negative inference," explaining that "Dr. Estonilo did not state that objective findings did not exist. These findings simply were not documented." (Pl. Reply at 8).

However, to the extent a lack of support constitutes a negative inference, it is a negative inference the Regulations expressly permit the ALJ to make. Pursuant to 20 C.F.R. §404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." *Id.* Similarly, Plaintiff asserts that the ALJ's reliance on a lack of objective findings constitutes consideration of extra-record evidence, or an imputation of findings, explaining that "Dr. Estonilo's objective evidence upon which his opinion relies is not memorialized in the record is extra-record evidence" and "[t]he mere fact that Dr. Estonilo is a treating source does not authorize an ALJ to speak for Dr. Estonilo when Dr. Estonilo has not spoken. Under the regulations, an ALJ must evaluate a treating source's opinion. 20 CFR § 404.1527 An ALJ does not evaluate his or her belief about what a treating source's opinion never obtained is believed to be." (Pl. Brief at 9). Plaintiff finally asserts that the ALJ's reliance on a lack of

support constitutes speculation. (Pl. Brief at 9-10). Even accepting Plaintiff's premise that a lack of evidence constitutes extra-record evidence, speculation, or an imputation, again, this is the type of evidence the ALJ is expressly authorized to consider. *See* 20 C.F.R. §404.1527(c)(3).

Plaintiff asserts that the ALJ should have recontacted Dr. Estonilo to ask him if objective findings supported his opinion. (Pl. Brief at 8-9). However, Dr. Estonilo was directly asked whether objective findings supported his opinion. (Tr. 958-65). The form that Dr. Estonilo completed specifically asks the doctor to "identify the positive clinical findings that demonstrate and/or support your diagnosis and indicate location where applicable" and to "identify the laboratory and diagnostic test results which demonstrate and/or which support your diagnosis." (Tr. 958-59). Dr. Estonilo left the portion regarding laboratory and diagnostic test results blank. (Tr. 959). For positive clinical findings, he cited only "endocrinology evaluation," "joint pain" in his back, leg, ankle, and foot, and "prolonged use of narcotics [with] very poor response (no evidence of drug misuse, abuse nor diversion)." (Tr. 958). None of these are positive clinical findings. As discussed above, Plaintiff's reports of pain do not constitute objective evidence simply because they occur in a medical record. *Supra*. Plaintiff has provided no reason to conclude that, if Dr. Estonilo were asked the same questions again, he would provide any different response. (Pl. Reply).

Moreover, Plaintiff does not provide any challenge to the ALJ's other two reasons to discount Dr. Estonilo's opinion: his arrest for illegally prescribing narcotic and its inconsistency with other evidence in the record. *Supra.* Dr. Estonilo's opinion was inconsistent with other evidence in the record, including internal inconsistencies. Dr. Estonilo opined that Plaintiff could sit, stand or walk combined for less than three hours out of an eight-hour workday and was essentially precluded from using his arms, hands, or fingers. (Tr. 960-61). However, he also opined that he had "been able to completely relieve the pain with medication without unacceptable side effects," Plaintiff's symptoms would not increase if he were placed in a competitive work environment, and Plaintiff would not need to take "unscheduled breaks to rest at unpredictable intervals during an 8-hour working day." (Tr. 960-63). When how often Plaintiff would be absent from work, he checked every available option: "more than three times a month," "about two to three times a month," "about once a month," and "less than once a month." (Tr. 964). Dr. Estonilo's opinion was also inconsistent with Dr. Maas's opinion, and Plaintiff never acknowledges Dr. Maas's opinion. (Tr. 88); (Pl. Brief); (Pl. Reply). The ALJ was entitled to resolve the conflicting medical opinions in favor of Dr. Maas. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). The Court finds no merit to this allegation of error and does not recommend remand on these grounds.

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.    This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: September 4, 2015                           s/Gerald B. Cohn
                                        GERALD B. COHN
                              UNITED STATES MAGISTRATE JUDGE